UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


BENJAMIN RUSSELL GROTHE,    )
           )
      Plaintiff,    )
           )
     vs.     )   Case No. 1:14CV72 CDP
           )
CAROLYN W. COLVIN,    )
Acting Commissioner of Social Security, )
           )
     Defendant.    )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Benjamin Russell Grothe's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401 *et seq.*, and his application for supplemental security income under Title XVI,

42 U.S.C. §§ 1381 *et seq.*  Grothe claims he is disabled because of problems with

his back, left leg, right shoulder, and both hands.  After a hearing, the

Administrative Law Judge concluded that Grothe was not disabled.  After

receiving additional evidence, the Appeals Council agreed with the ALJ.  Because

I conclude that when the additional evidence is considered the ALJ's decision is

not supported by substantial evidence on the record as a whole, I will reverse and

remand for further proceedings.

## I.  Procedural History

In June 2010, Grothe filed applications for disability income benefits and supplemental security income.  He alleged an onset date of June 30, 2008.  When his applications were denied, he requested a hearing before an administrative law judge.  Grothe then appeared with counsel at an administrative hearing on June 18, 2012.

After the hearing, the ALJ denied Grothe's applications, and he appealed to the Appeals Council.  Grothe's counsel submitted additional medical records to the Appeals Council.  On April 25, 2014, the Council denied his request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Grothe now appeals to this court.  He argues that the ALJ's finding of non-disability is not supported by substantial evidence, specifically because (1) the ALJ failed to give appropriate weight to the opinion of Grothe's treating physician; and (2) the ALJ improperly discredited Grothe's subjective testimony about his own limitations and pain.

## II.  Evidence Before the Administrative Law Judge

### *Medical Records*

Medical records before the ALJ indicate that Grothe sustained several injuries from a motorcycle accident in 1993, including a broken left leg which

required the insertion of a metal rod and screws, and amputation of his left ring and middle fingers. He continued to work after that time until June of 2008. He sustained a shoulder injury on the job in 2007, and underwent rotator cuff repair surgery. He had surgery in 2009 to remove a large bone growth from his hip, and in 2011 had further surgery to remove the rod in his leg.

Grothe was seen at Aurora Health Center on November 2, 2006 for an x-ray of his lumbar spine. The test revealed a potential pars defect, and Dr. Robert Dizor recommended an MRI or CT scan to follow up. (Tr. 346). On November 15, 2006, Grothe had a CT scan of his lumbar spine. Dr. Dizor found a fracture through the left pars interarticularis at L5 with sclerotic margins. The scan also showed some mild disc space narrowing at L3-4 and L5 – 51, but no significant bulge or protrusion on the soft tissue windows. Dr. Dizor concluded Grothe suffered from mild spondylosis on the left side. (Tr. 344).

On February 8, 2007, Grothe received a steroid injection into his L4-5 and L5-51 facet joints for pain control. (Tr. 347).

On March 5, 2007, Dr. John K. Lee performed an MRI of Grothe's lumbar spine. He found mild loss of disk space height and signal at the T11 – 12 level compatible with degenerative disk changes, but no bulge or protrusion. Dr. Lee

concluded that there was no significant disk disease in the lumbar region.  He

suspected spondylolysis on the left side at L5, but no spondylolisthesis.[1]  (Tr. 338).

On March 19, 2008, Grothe was again seen in the emergency room at Bay

Area Medical Center.  He complained of neck and lower back pain resulting from a

car accident a few days before.  No fractures of the spine were found.  He was

diagnosed with neck and back strain.  He was prescribed ibuprofen 800 mg and

Skelaxin 800 mg, and instructed to apply ice every two hours while awake.  He

was excused from work for the next three days. (Tr. 411).

Grothe was admitted to Bellin Health System Hospital Center on September

9, 2009 because of left hip pain secondary to heterotopic bone formation

surrounding his intramedullary rod.  (Tr. 443).  He had surgery that same day to

remove a baseball size bone spur in his left lateral hip region.  (Tr. 368, 445).

On October 8, 2009, Grothe reported to Bay Area Mobility Center for an

initial physical therapy evaluation.  (Tr. 368).  He attended a total of 14 sessions,

until his Medicaid authorization expired on November 20, 2009.  (Tr. 372).  Grothe

canceled his physical therapy appointments on 10/9/09, 10/19/09, 10/27/09,

10/29/09, 11/09/09, and 11/13/09.  (Tr. 378 – 383).  He reported his pain level

---

[1] Spondylolysis is a defect or fracture of one or both of the wing-shaped parts of a vertebra.
These "wings" help keep the vertebrae in place. When a "wing" is absent… or damaged, a
vertebra can slide forward or backward over the bone below, sometimes pressing on the spinal
cord or a nerve root. This slipping, called spondylolisthesis, usually happens at the base of
the spine. Symptoms of spondylolisthesis can include back pain and numbness or weakness in one or
both legs, sometimes leading to a loss of leg function.  WebMD, (Last Revised June 4, 2014).
http://www.webmd.com/a-to-z-guides/spondylolysis-and-spondylolisthesis-topic-overview.

decreased from a 7 to a 5 on a ten-point scale as a result of the therapy sessions. (Tr. 394, 396). On November 6, 2009, he reported that he no longer had lower back pain, and was able to walk through the woods and hunt. (Tr. 407). He was walking 1/4 mile every day to hunt. On November 18, 2009, he reported that his hip had been swollen and his pain level had increased back to a level 8 out of 10. (Tr. 407).

On October 2, 2009, Grothe was seen in the emergency room at Bay Area Medical Center. He complained of increasing left hip pain. He had run out of his Vicodin prescription that day. An x-ray showed radiolucency (transparency) of the intramedullary rod which may have been a fracture. He was given Lortab in the ER, and a prescription for more Vicodin. He was also advised to be on crutches and non-weight bearing. (Tr. 359).

On December 21, 2009, Grothe was seen by Dr. Douglas Yeatman as a new patient at Aascend Pain Institute in Wisconsin. He complained of pain in his right shoulder, low back, left knee, and left hip. (Tr. 487). He rated his pain as a severe throbbing with moderate ache and pressure component. (Tr. 488). He reported that the pool therapy he completed at Bay Area Mobility Center helped a lot. He also reported that an anti-inflammatory and hydrocodone helped with his pain. (Tr. 489). Upon examination, straight leg testing was negative. Dr. Yeatman noted that Grothe had a decreased range of motion with decreased flexibility of the

cervical spine with extension rotation.  He was diagnosed with a fractured femur, lumbar pain, left shoulder pain, cervical radiculopathy, and myofascial pain.  (Tr. 490).  Dr. Yeatman ordered an MRI of Grothe's lumbar spine.  He prescribed a Fentanyl patch (12 mcg/hr), Diclofenac Potassium (25 mg), and Cyclobenzaprine (10 mg).  (Tr. 491).

Grothe was seen by Dr. Carrie Voss for a follow-up exam at Aascend Pain Center on January 11, 2010.  He complained of left hip and left knee pain, which he rated at a level 9.  (Tr. 492-493).  He also reported headaches and numbness and tingling in his upper extremities.  Dr. Voss prescribed Kadian (30 mg), and took him off of the Fentanyl patch due to a rash developing.  (Tr. 493).

Grothe was seen at Cape Radiology Group on February 18, 2010.  Dr. Richard Stork performed a scanogram to measure Grothe's leg lengths.  The test revealed that his right leg is 3 mm shorter than his right leg.  (Tr. 351).  He was told to see his physical therapist to fit a heel lift for his right foot.  (Tr. 467).  Dr. Stork also performed a cervical spine exam and noted that vertebral body heights and disc spaces were well maintained, and vertebral alignment was satisfactory. No gross fracture or subluxation was seen.  (Tr. 352).

Advanced Pain Center

Grothe was under the care of Dr. Abdul Naushad at Advanced Pain Center from February of 2010 through June of 2010.  On February 4, 2010, Grothe made

his second visit to Advanced Pain Center.[2]  His chief complaint was left lower extremity pain and low back pain.  He assessed his lower extremity pain at a level 9.  He stated that his pain is present constantly, interferes with his sleep, and is aggravated by standing or walking.  Medication and applying heat help to relieve the pain.  Grothe assessed his low back pain at a level 5.  It does not interfere with his sleep, but is aggravated by bending forward.  Grothe also reported cervical pain.  (Tr. 473).   He assessed this pain at a level 5.  It is aggravated by physical activities, and can be relieved by applying heat.  (Tr. 474).  Grothe was diagnosed with cervical discogenic pain, cervical facet arthropathy, left L5 spondylolysis, lumbar facet arthropathy, and osteoarthritis.  (Tr. 478).  His current medications at the time of the visit were Cyclobenzaprine HCL (10 mg), Diclofenac Potassium (50 mg), and Kadian (30 mg).  He reported an adverse reaction to the Kadian, including hot flashes and cold sweats.  (Tr. 474).  His medication regimen was changed to add Diclofenac, Percocet (10-325 mg), Zanaflex (4 mg), and Lidoderm (5%).  (Tr. 478).

Grothe had a follow-up visit at Advanced Pain Center two weeks later, on February 18, 2010, to assess the effectiveness of his new medications.  The effectiveness of the Lidoderm, Percocet, and Zanaflex was evaluated as good.  (Tr. 468).  Grothe denied any side effects from his medication.  (Tr. 470).  He further

---

[2] Medical records indicate that this was visit #2, but there is no documentation of the first visit in the evidence before the court.  (Tr. 473).

reported that his physical functioning, family relationships, social relationships, mood, sleep patterns, and overall functioning were all better.  (Tr. 471).  His prescriptions were each renewed at the same dosages for an additional 30 days. (Tr. 470).

Grothe had another medication follow-up on March 18, 2010.  His diagnosis remained the same.  The effectiveness of his medications was evaluated as good. No changes were made to his medications, and he continued to report improvement in his activities of daily life.  (Tr. 465 – 66).

Grothe had a follow-up visit for chronic left hip pain on April 15, 2010.  He rated his pain at a level 5.  He was assessed with pain in joint pelvic region and thigh, pain in joint lower leg, and spondylolysis.  He demonstrated a mild to moderate limp while walking.  He also had moderate-severe tenderness in his left hip, and diffusely moderate muscle tenderness on his left side.  (Tr. 462).  Voltaren Gel was added to his current medications.  (Tr. 463).

Grothe again visited Advanced Pain Center on May 13, 2010.  He complained of chronic low back pain, as well as pain in his left hip and left leg. His current medications were: Cyclobenzaprine HCI (10 mg), Diclofenac Potassium (50 mg), Diclofenac Sodium gel (as needed), Endocet (Oxycodone w/ acetaminophen tab 10 – 325 mg), Kadian (30 mg), Lidocaine patch (5%), and Tizanidine HCI (4 mg).  (Tr. 458).  He continued to report no side effects from any

of his medications. (Tr. 459). Grothe had mild tenderness in his cervical spine, and moderate tenderness in his lumbar spine. (Tr. 458). He also had a moderate limp while walking. He was diagnosed with cervical discogenic pain, cervical facet arthropathy, lumbar facet arthropathy, left L5 spondylolysis, and osteoarthritis. (Tr. 460).

Grothe had another follow-up visit on June 10, 2010 for a refill of his prescriptions. (Tr. 454). He continued to report no side effects from any of his medications. (Tr. 455). He ran out of his medications early because he had been taking extra, despite repeated warnings from his physicians at Advanced Pain Center. (Tr. 456).

Dr. Jetuan Rowley

On August 31, 2010, Grothe was seen as a new patient by Dr. Jetuan Rowley.[3] He was there to establish care for his back pain. He reported his pain at a level seven, occurring persistently. Grothe further reported that his pain was aggravated by changing positions, standing, walking, and any activity, but that his symptoms were relieved by pain medications. (Tr. 504). Upon examination, Dr. Rowley found that Grothe had spinal posterior tenderness, paravertebral muscle

---

[3] The records show Dr. Rowley's address as 100 S. Mt. Auburn Rd., Suite 100, Cape Girardeau, MO, and initially bear designations of Plaza Primary Care West of Southeast Missouri Hospital in 2010 (Tr. 674). The designation switches to Southeast Primary Care – Mt. Auburn in 2011 (Tr. 678). Dr. Dannette Miller's records, which were provided to the Appeals Council and are discussed later, show the same address and suite number and the same designation of Southeast Primary Care – Mt. Auburn (Tr. 680). It thus appears that Drs. Rowley and Miller were in the same primary care practice affiliated with Southeast Missouri Hospital.

spasms, and bilateral lumbosacral tenderness. Grothe also had extremely limited extension of his leg. A straight leg raising test was negative in both the supine and sitting positions. (Tr. 506). Dr. Rowley prescribed endocet (10-325 mg) as needed for pain, and continued Grothe on Lidoderm and Zanaflex. He recommended an MRI before seeing an orthopedic spine specialist in a few months. (Tr. 506).

Grothe had an MRI of his lumbar spine on January 4, 2011 at Southeast Missouri Hospital. Dr. Sharon Wallace interpreted the results and found no lumbar disc herniation, but mild lumbar degenerative spondylosis. (Tr. 499).

On January 6, 2011, Grothe had an x-ray of both femurs. Dr. William Pelton interpreted the results. The x-ray showed a left femur intramedullary rod with fixation screws, as well as a segment of irregular cortical thickening with heterogeneous sclerosis. (Tr. 495). On the same day, Grothe had an x-ray of both hips and his pelvis. (Tr. 497). Dr. Pelton noted that calcifications seen in the region of the proximal left femur likely relate to postsurgical or post-traumatic heterotopic ossification. (Tr. 497).

On January 7, 2011, Grothe had another office visit with Dr. Rowley to discuss the test results. Dr. Rowley noted that the MRI showed facet arthropathy and some disc bulges. (Tr. 501).

<u>St. Louis Spine Care Alliance</u>

On January 18, 2011, Grothe was seen at St. Louis Spine Care Alliance. He complained of pain in his low back, and soreness to his left hip and left thigh. His current medications were Oxycodone-Acetaminophen (10-325 mg) and Zanaflex (4 mg). (Tr. 532). A straight-leg raising test of each leg was negative at 90 degrees. (Tr. 533). Grothe filled out a patient history health questionnaire, in which he stated his injury was ongoing since 2003. (Tr. 535). The last time he worked was July 3, 2008. (Tr. 539). He also listed that he could drive, walk, climb stairs, do housework, sit, do some yard work, stand, and get dressed. (Tr. 538). He reported that his pain varied from 40% intensity on his best days to 90% on his worst days. (Tr. 540). Dr. David Robson assessed his condition as low back pain and left hip pain, status post trauma, and a possibility of synovial cysts on the opposite side. Dr. Robson ordered an EMG and nerve conduction study. (Tr. 534).

On January 26, 2011, Dr. Patricia Hurford performed an EMG/nerve conduction study to rule out radiculopathy versus peripheral nerve entrapment. (Tr. 541). The results showed a normal study of the left lower extremity and lumbar paraspinals. No electrodiagnostic evidence was found of a peripheral nerve entrapment/compression, plexopathy or lumbrosacral plexopathy. (Tr. 542).

Grothe returned to Dr. Robson for a follow-up on February 10, 2011.  He complained of pain in joint – hip and pelvic area, low back pain, postoperative heterotopic calcification, and tactile decrease in his leg and foot.  His current medications were Norflex tabs, Oxycodone-Acetaminophen  (10-325 mg), and Zanaflex (4 mg).  (Tr. 515).  After reviewing the EMG results, Dr. Robson believed his pain resulted mainly from his left hip, and referred him to Dr. Kurt Merkel for further evaluation.  (Tr. 516).

Dr. Kurt Merkel

On February 2, 2011, Grothe was seen by Dr. Kurt Merkel at Town & Country Orthopedics, Inc.  Dr. Merkel noted that Grothe walks with a slight limp, that he had tenderness over the greater trochanter, and significant weakness against gravity due to hip abduction.  He also noticed a positive Trendelenburg sign and gait.  (Tr. 641).  He assessed Grothe with enthesopathy of the hip region, and recommended surgery to remove the rod and screws in his left leg.  (Tr. 653).

On March 18, 2011, Grothe had his intramedullary rod and screws removed by Dr. Merkel at Missouri Baptist Medical Center.  He was released from the hospital two days after the surgery, fully weight bearing at the time of his discharge.  (Tr. 564).

Grothe continued to see Dr. Merkel.  On April 1, 2011, Dr. Merkel assessed Grothe with unspecified mechanical complication of his internal orthopedic device,

implant, and graft.  Grothe was walking with crutches at this visit.  It was recommended that he start to wean down his pain medications.  He was also sent to physical therapy.  (Tr. 651).  On May 27, 2011, Dr. Merkel assessed Grothe with unspecified mechanical complication of his internal orthopedic device, implant, and graft.  Grothe was still walking with a cane at this visit.  Dr. Merkel ordered an MRI.[4]  (Tr. 642).  On July 18, 2011, Dr. Merkel diagnosed Grothe with a possible gluteal neuropathy, and ordered an EMG of the left lower extremity.

Following his surgery, Grothe attended physical therapy at Mid America Rehab for eleven visits from April 5, 2011 through May 19, 2011, and an additional thirteen visits from June 15, 2011 through August 10, 2011.  (Tr. 604, 572).  His primary complaint was pain and weakness in his left leg from hip to knee.  (Tr. 631).  Grothe reported that he slipped and fell on wet concrete on July 4, 2011, increasing his pain.  (Tr. 587).  The discharge note states that Grothe did not make any appreciable progress with therapy efforts.  (Tr. 572).

Dr. Glenn Landon, an orthopedic surgeon specializing in hip and knee surgeries, reviewed and evaluated Grothe's medical records and history.  (Tr. 553 – 62).  On October 12, 2011, he submitted a report opining that Grothe's pain was due primarily to abductor muscle damage from the heterotopic ossification and its removal.  (Tr. 657).  He noted that further physical therapy was unlikely to be

---

[4] There are no records indicating whether this MRI occurred.

effective and suggested Grothe consult a specialist in reconstructive hip surgery. He said that Grothe should strongly consider a new surgical procedure involving transfer of gluteus maximus tissue to the greater trochanter. (Tr. 658).

On January 9, 2012, Grothe had a hip evaluation performed by a doctor whose name is illegible. (Tr. 668 – 70). He was diagnosed with left hip abductor weakness, back pain, and pain to his left lateral hip. This doctor recommended physical therapy and inversion therapy.

### *Medical Source Statement*

On January 2, 2012, Dr. Danette Miller completed a Medical Source Statement – Physical for Grothe. (Tr. 662 – 65). She noted the following impairments: left hip atrophy, chronic left buttocks, hip, and leg pain, and neuropathy. (Tr. 662). She assessed the following physical strength limitations: lift or carry frequently up to 10 lbs.; lift or carry occasionally up to 15 lbs.; stand or walk continuously less than 15 minutes; stand or walk throughout an 8-hour workday up to 30 minutes; sit continuously less than 15 minutes; sit throughout an 8-hour workday up to 1 hour; push/pull limited – unable to use left leg and foot for any pushing or pulling. (Tr. 662 – 63). She further noted that he can never climb, stoop, kneel, crouch, or crawl, and that he can occasionally balance, bend, and reach. He should never be exposed to vibrations, hazards, or heights, and should avoid moderate exposure to extreme cold, heat, weather, and wetness or humidity.

He should avoid concentrated exposure to dust and fumes.   He needs to lie down or recline five to six times per day for fifteen to thirty minutes at a time.  His narcotic pain medications cause sedation.  (Tr. 664).

## *Medical Statement for Social Security Disability Claim*

Dr. Miller completed a Medical Statement Regarding Hip Problems for Social Security Disability Claim form.[5]  (Tr. 666).  She assessed Grothe with chronic hip pain, chronic hip stiffness, limitation of motion of hip, hip instability, hip contracture, bony or fibrous ankylosis of hip, joint space narrowing of hip, bony destruction of hip, inability to ambulate effectively, and a history of reconstructive surgery or surgical arthrodesis of hip and ability to ambulate effectively did not return or is not expected to return within 12 months of onset.

Dr. Miller further assessed that Grothe can work up to one hour per day, stand for fifteen minutes at one time, sit for fifteen minutes at one time, occasionally lift twenty pounds, frequently lift ten pounds,  occasionally bend and balance, and never stoop, climb a ladder, or climb stairs.  She opined that Grothe suffers from severe pain.  (Tr. 666).

## *Testimony at the June 18, 2012 Hearing*

Grothe testified at the hearing before the ALJ.  He stated that he was 35 years old at the time of the hearing.  He completed twelfth grade, but did not have

---

[5] This form is undated, so it is unclear whether it was completed before or after the medical source statement.

enough credits to earn his high school diploma. He does not have a GED. He testified that he had been living with his parents in their home since January of 2010. His son, aged sixteen, lived with him full-time and his daughter, aged thirteen, lived with him during the summers.

Grothe testified that he last worked as a machine operator in a paper factory, from 2000 – 2008. He lifted 100 pounds at a time at that job. He has also worked as an assembler at a wicker furniture company, a grinder in a foundry, an automotive detailer, and a maintenance worker.

Grothe testified that he was injured in a motorcycle accident in 1993. He has had multiple surgeries on his left hip and leg since that time. He also had multiple surgeries to his left hand, leaving his left middle finger amputated just above the middle joint, and his left ring finger amputated just below the middle joint. He testified that he experiences "phantom fingers," where he feels the fingers are there even though they are missing. This often causes him to drop things. On the right hand, Grothe testified that he has had four surgeries during 1993 – 1996 to repair his right pinky finger. He is now missing the middle joint completely and cannot bend the finger at all.

Grothe testified that he injured his shoulder on the job. It is unclear if this injury and subsequent surgery took place in 2007 or 2008. (Tr. 55, 59).[6] He

---

[6] There are no medical records in evidence regarding this surgery.

received a workman's comp settlement for this injury as well as unemployment benefits.[7]  At the same time, he started having trouble with his hip again and had corrective surgery.  (Tr. 58).  He testified that his hip and lower back hurt all the time.  On a daily average, he rates his pain a seven on a scale of one to ten.  OxyContin reduces the pain level to a three or four when he is lying down at night.

Grothe testified that he experiences panic attacks, but Xanax controls them.  He further testified that he has problems concentrating due to constant pain.  Grothe testified that he feels depressed, and cries occasionally.  He is not under the care of a psychologist or psychiatrist, has never been in a mental hospital, and has never felt suicidal.

Grothe testified that he is on the following medications: OxyContin, hydrocodone, Lexapro, and Xanax.  He further testified that the OxyContin causes him constipation, nausea, and makes him tired.  The hydrocodone also makes him feel very tired, and forgetful.

Grothe testified that he can sit for about an hour, and then he needs to stand up.  He can stand for approximately twenty minutes at a time, and then he needs to sit or lie down.  He testified that he does this sitting and standing repeatedly all day.  He further testified that he lies down five to six times in an eight hour day, for fifteen to thirty minutes at a time.  He can walk three to five blocks.  He

_____

[7] These benefits ended in the beginning of 2010.

testified that he cannot bend, stoop, crouch, kneel, or crawl.  His son helps him to put on his socks and shoes in the morning.  He can climb some stairs as long as he has a hand rail.  Grothe testified that he uses a cane at the advice of his attending physician, Dr. Danette Miller.  He has been seeing Dr. Miller since 2010.  He further testified that he wears a brace for at least eight hours a day around his lower back to help him with balance.  The brace is uncomfortable, but without it, he tends to fall.  He fell once in the shower, and once in the driveway.

Grothe testified that he drives approximately twenty-five (25) miles per week.  He does not cook, clean, wash dishes or laundry, mow the grass, nor performs any other household chores.  The ALJ and Grothe had the following exchange:

> *ALJ*:     In 2010, you say you lived with your parents with your two
> kids, no problem with personal care, cut grass, do laundry,
> wash dishes, drive, shop a few hours and go walk a mile.
> How much of that do you still do?
> *Grothe*: I don't do any of that.  Actually, that – when I filled that out, I
> mean, it was – when I filled that out, that was more of a
> mistake when I filled it out.

(Tr. 66).  Grothe testified that he spends most of his waking time watching television.  He rarely goes out of the house except to walk a few blocks daily, or to take his son to school.  He spends his evenings at home.

Medical expert Dr. Arthur Lorber also testified before the ALJ.  Dr. Lorber did not examine Grothe in person, but did review the medical evidence in the

record.  (Tr. 38 – 39).  Dr. Lorber also asked Grothe several questions about the hip spica brace he was wearing, and the medications he was currently taking.  (Tr. 39 – 42).

Dr. Lorber testified that Grothe was in a motorcycle accident in 1993, and sustained a fracture of his left femur.  He testified that Grothe was treated with the insertion of an intramedullary rod which had four locking screws.  Dr. Lorber testified that a scanogram in February of 2010 revealed a 3 mm leg length inequality, which would not be clinically apparent and is a non-issue.  He testified that at some point after the insertion of the intramedullary rod, one of the two distal locking screws broke.  Dr. Lorber also considered this to be a non-issue and testified that it would not be a source of pain.  Dr. Lorber testified that Grothe developed heterotopic bone formation.  He explained that this bone formation would have occurred within the first year after the insertion of the rod, so Grothe had lived with it for at least fifteen years before the excision, and performed relatively strenuous jobs during that time.  Dr. Lorber testified that Grothe is ambulatory and does not use an assistive device aside from the brace.  Dr. Lorber testified that Grothe does not meet or equal Listing 1.02A as a result of his left hip or femoral condition, but he does have a severe impairment as defined by the Social Security Administration.

Dr. Lorber testified that the x-rays in the record showed no evidence of a compression fracture in Grothe's lumbar spine. He stated that there was no convincing evidence of focal neurologic deficit,[8] nerve root impingement, or severe or significant central spinal canal stenosis. Dr. Lorber testified that Grothe does not meet or equal Listing 1.04A or C, but he does have a severe impairment as defined by the Social Security Administration.

Dr. Lorber further testified that Grothe sustained injuries to his left third and fourth fingers at the time of his motorcycle accident, and underwent amputation of those fingers. He testified that the amputation affects Grothe's ability to perform fine fingering activities and handling. Dr. Lorber testified that at some time in the past, Grothe sustained an injury to his right shoulder and underwent arthroscopy to repair his rotator cuff. Dr. Lorber testified that Grothe does not meet or equal Listing 1.02B.

Dr. Lorber testified that Grothe had a reduced functional capacity (RFC) as follows. He could occasionally lift 20 pounds and frequently lift 10 pounds; could occasionally bend, stoop, crouch, and kneel, but should not crawl; should not work at unprotected heights, climb ladders, scaffolds, or ropes; should avoid exposure to concentrated vibrations; could occasionally operate foot pedals with either foot;

---

[8] A focal neurologic deficit is a problem with nerve, spinal cord, or brain function. MedLine Plus, (Last Revised: December 15, 2014).
https://www.nlm.nih.gov/medlineplus/ency/article/003191.htm.

could occasionally climb and descend stairs and ramps; could perform overhead activities with his right arm occasionally; and, could push or pull frequently with his right arm in a position other than overhead. Dr. Lorber testified that in regards to manipulative abilities, Grothe could only occasionally perform fine fingering with the left hand but had no restrictions on the right hand. Dr. Lorber also testified that Grothe' ability to stand and walk was limited to no more than four hours per day for one hour at a time; that he could sit for at least six hours per day for one hour at a time, with the option to stand for two or three minutes after one hour of sitting.

Vocational expert John F. McGowan also testified before the ALJ. The ALJ asked Mr. McGowan to assume a hypothetical person the age of 36 with a limited education and past relevant work experience the same as Grothe, capable of performing only sedentary work. The hypothetical person could lift, carry, push, and pull 20 pounds occasionally, 10 pounds frequently, sit for six hours out of eight, stand and/or walk for two out of eight, with a sit/stand option during the day. The person could have no exposure to ladders, ropes or scaffolds; occasional climbing, stopping, crouching, or kneeling, but no crawling or balancing; occasional overhead reach on the right upper extremity; no fine fingering or gross manipulation with the left handed. The person is right-handed; can occasionally use foot pedals; has no exposure to moving machinery or unprotected heights; has

no concentrated exposure to vibration; and, is limited to simple, repetitive tasks and instructions. With those assumptions, the vocational expert testified that such a person could perform work as a surveillance system monitor. The expert further testified that Missouri had 1,950 such jobs, and there were 81,410 nationally.

### *Evidence Submitted to the Appeals Council[9]*

The following additional evidence was presented to the Appeals Council.

Dr. Corey Solman

On June 20, 2012, Dr. Cory Solman of the U.S. Center for Sports Medicine evaluated Grothe for left hip pain and weakness. He concluded that the removal of the heterotopic ossification, along with a large portion of the abductor muscle, left Grothe with some chronic nerve pain and permanent and persistent weakness in his hip abductors. (Tr. 672). Dr. Solman recommended that it would be beneficial and medically necessary for Grothe to wear a hip spica brace to allow him to walk better, have less pain, and be able to perform activities of daily living. (Tr. 672).

Dr. Stephanie Miller

The first records from Dr. Stephanie Miller are dated October 12, 2011. (Tr. 680). This visit is designated as an "established patient/office visit" and, as noted above, Dr. Miller appears to be in the same practice as Grothe's earlier primary

---

[9] Although this evidence was not submitted to the ALJ, "where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

care doctor, Dr. Jetuan Rowley. His chief complaint was left leg pain. (Tr. 681). Upon examination, she noted significant weakness in his left hip flexion and knee extension, as well as wasting of his left gluteus and quads. Her treatment notes state "He has had multiple surgeries to repair [his left leg.] One of these surgeries ended up severing a nerve in the left glut that has left him with more weakness and wasting." She assessed him with pain in joint involving pelvic region and thigh, stemming from nerve damage and prior surgeries. She replaced his valium prescription with one for baclofen. (Tr. 682). At a follow up visit on November 10, 2011, Dr. Miller again noted that Grothe was positive for bone/joint symptoms, and muscle weakness in his lower left extremities. Grothe reported that the baclofen was helping more than anything else so far. (Tr. 684).

On December 20, 2011, Grothe again saw Dr. Miller, complaining of left hip pain. He stated that the pain had become "unbearable," and that he was unable to sleep longer than two hours per night. (Tr. 687). Her treatment notes also indicate that Grothe had left hip pain with lateral palpation, atrophy of hip and thigh, decreased mobility, and gait with limp. Dr. Miller increased his pain medications, and noted that he had an upcoming appointment with a specialist to discuss possible reconstructive surgery of his hip. (Tr. 688).

At a follow up visit on January 20, 2012, Grothe stated that the new medications had helped somewhat. Dr. Miller noted that he was positive for back

pain, bone/joint symptoms, and muscle weakness in the lower left extremities.

Grothe also complained of depression at this visit. Dr. Miller noted that he had the

symptoms of a major depressive episode. (Tr. 689).

On February 3, 2012, Dr. Miller saw Grothe because of pain in his left hand.

He had fallen at home three days earlier, and his hand was swollen and aching. No

obvious fracture was seen on xray. (Tr. 692).

On February 20, 2012, Grothe was seen by Dr. Miller for a medication refill

and follow up of his depression. Dr. Miller noted that his status was improved by

Lexapro. Grothe reported that he was starting to feel like his old self again. (Tr.

694).

On February 24, 2012, Grothe was seen by Dr. Jamie Harrison for a sudden

swelling of his ankle. (Tr. 697). Dr. Harrison assessed him with swelling of limb

on the left side, above the baseline chronic edema. Dr. Harrison also noted that

Grothe had recently been on a three hour car ride. She ordered an ultrasound to

rule out deep vein thrombosis, and instructed Grothe to return to the clinic in one

week to follow up with his primary care physician, Dr. Miller. (Tr. 698).

Grothe saw Dr. Miller again on March 5, 2012, to discuss his medications.

He requested that he be switched to Xanax and taken off of Ambien and Valium.

(Tr. 699). Dr. Miller agreed to this change. (Tr. 700). He returned again on

March 19, 2012 for a medication follow up, and reported that he was doing much

better on the Xanax.  He used it 2-4 times daily, and was starting to be able to sleep better.  (Tr. 702).  He was also given a prescription for Jobst stockings, due to some swelling of his leg.  (Tr. 703).

Dr. Miller saw Grothe on June 26, 2012 for another follow up.  She refilled his Xanax prescription, and noted that he was now wearing a fixed brace for his low back and left upper leg and hip.  She noted that he feels more stable with the brace.  (Tr. 705).  She also noted that Grothe had been told by specialists in St. Louis that his hip and leg damage is likely permanent and future surgeries will not fix the problem.  He was instructed to call for his monthly pain medications.  (Tr. 706).

## III.    Standard for Determining Disability Under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a),

416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work. If so, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, she is declared disabled. 20 C.F.R. § 404.1520; § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is

uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's findings. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

## IV.   The ALJ's Decision on September 20, 2012

The ALJ found that Grothe was not disabled from June 30, 2008, until the time of his decision. In reaching his decision, he followed the five-step sequential evaluation process, noting at step one that Grothe had not engaged in substantial gainful activity since June 30, 2008.

Proceeding to step two, the ALJ found that Grothe had the following severe impairments: status post left femur fracture, status post right rotator cuff repair,

status post left finger amputation, left abductor muscle damage, possible spondylosis at L5, and neuroforminal stenosis at L3 through L5. The ALJ further found that Grothe had no mental impairment or combination of mental impairments that limited his ability to perform basic work activities. In making this determination, he stated: "The claimant has no restrictions in activities of daily living, social functioning, or maintaining concentration, persistence, or pace. The claimant has had no repeated episodes of decompensation of extended duration resulting in a loss of adaptive functioning." (Tr. 21).

At step three, the ALJ found that Grothe did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that there was no consistent evidence over a twelve month period of gross anatomical deformity with involvement of a major peripheral weight-bearing joint with the inability to ambulate effectively or to perform fine or gross movements effectively on a sustained basis. Additionally, there was no medical evidence over a twelve month period of nerve root compression. The ALJ also noted that medical expert Dr. Lorber testified that Grothe did not meet or medically equal any listing, and specifically did not meet listing 1.02 or 1.04.

The ALJ then made a determination of Grothe's residual functional capacity. He found that Grothe could lift and carry twenty pounds occasionally and ten

pounds frequently with sitting six hours, standing two hours, and walking two hours, with a sit/stand option, during a typical eight-hour workday. Grothe could occasionally stoop, crouch, kneel, and climb ramps and stairs, but could not crawl, balance, or climb ladders, ropes, or scaffolds. He could occasionally perform overhead reaching with the right upper extremity. He could not perform fine fingering or gross manipulation with the left upper extremity. He could occasionally operate foot controls. He should avoid exposure to vibration, moving machinery, and unprotected heights. He was limited to simple, repetitive tasks.

The ALJ also considered Grothe's daily activities, and concluded that to the extent they are restricted, they are restricted by his choice and not by any apparent medical proscription. He further concluded that not all of Grothe's alleged symptoms were credible. For instance, Grothe alleged his disability began on June 30, 2008, but the ALJ found no evidence of record documenting any specific medical event occurring on that date. The ALJ also noted that Grothe had worked for approximately sixteen years after the motorcycle accident which caused the majority of his complaints, before alleging disability. At least five of those years (2003 – 2008) he continued to work even while complaining of back and hip pain. Finally, the ALJ noted that Grothe received a year of unemployment compensation after the alleged onset date, which indicates that Grothe believed he was able and willing to work, and that he was actively searching for work.

At the fourth step, the ALJ concluded that Grothe was unable to perform any past relevant work, based on his residual functional capacity as explained above. The ALJ gave minimal weight to the report and opinion of Grothe's treating physician, Dr. Miller. He noted that the evidence of record failed to contain any specific treatment notes from Dr. Miller, that there were inconsistencies within Dr. Miller's cited limitations, and that the limitations imposed by Dr. Miller were not supported by the total evidence of record. The ALJ further noted that Dr. Miller's report was simply a pre-printed form questionnaire submitted to her by Grothe's attorney. The ALJ instead gave great weight to the opinions and findings of medical expert Dr. Lorber.

The ALJ then proceeded to the fifth and final step, and concluded that based on Grothe's age, education, work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that Grothe could perform. In making this determination, the ALJ specifically found that Grothe was a younger individual (between 18 – 49 years old) at the alleged disability onset date, had an 11th grade education, and was able to communicate in English. The ALJ further noted that if Grothe had the residual functional capacity to perform the full range of light or sedentary work, a finding of "not disabled" would be required. Since Grothe has additional impediments to performing all or substantially all of the requirements of this level of work, the ALJ posed a hypothetical to the

vocational expert.  The vocational expert testified that a hypothetical person with Grothe's same age, education, work experience, and residual functional capacity could perform the job of a surveillance system monitor.  There are 1,950 such positions in Missouri and 81,410 positions nationwide.

## V.    **Standard of Review**

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and

nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon

a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI. <u>Discussion</u>

Grothe argues that the ALJ erred by: (1) failing to give proper weight to the

opinion of his treating physician Dr. Danette Miller; and (2) failing to properly

consider the subjective testimony of Grothe because of a flawed and incomplete

credibility analysis.  I conclude that the ALJ's determination on both of these

issues would likely have been different had he considered the additional evidence

submitted to the Appeals Council.  Given this new evidence, the ALJ's conclusions

are not supported by substantial evidence on the record as a whole.

<u>Treating Physician</u>

A treating physician's opinions must be given controlling weight if they are

well-supported by medically acceptable clinical and laboratory diagnostic

techniques and not inconsistent with the other substantial evidence.  *Renstrom v.*

*Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012); *see also* 20 C.F.R. § 416.927(c).  But

because the record must be evaluated as a whole, the Eighth Circuit has cautioned

that the opinions of a treating doctor do "not automatically control." *Renstrom*, 680 F.3d at 1064. After reviewing the record as a whole, an ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. *E.g., Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

In this case, Dr. Stephanie Miller was Grothe's treating physician at the time of the hearing. She completed a medical source statement, checking boxes to indicate that Grothe could stand or walk continuously for less than fifteen minutes at a time, and for not more than thirty minutes total in an eight hour workday. She also indicated that he could sit continuously for less than fifteen minutes at a time, and for not more than one hour total in an eight hour workday. Finally, she opined that he needed to lie down or recline five or six times a day for fifteen to thirty minutes at a time (a total of one and a quarter hours on the low end, or as much as three hours at the high end.)

When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so. *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011). Here, the first reason the ALJ gave was that the evidence of record failed to contain specific treatment notes of Dr. Miller. Dr. Miller's treatment notes were later submitted to the Appeals Council. (Tr. 674 – 712). When new and material

evidence is submitted to the Appeals Council after the ALJ's decision, "the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b). "[T]he Appeals Council shall evaluate the entire record including the new and material evidence submitted. It will then review the case if it finds that the administrate law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.* When new evidence is considered by the Appeals Council, the court must consider it in determining whether The ALJ's decision is supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995).

The ALJ noted that there was no indication to support how long Grothe received medication or treatment from Dr. Miller. The additional evidence shows that Grothe was under Dr. Miller's care for at least eight months, from October 12, 2011 through June 26, 2012.[10] Dr. Miller's notes document ongoing pain and weakness throughout the time she was treating Grothe. On October 12, 2011, she noted significant weakness in his left hip and knee extension, and wasting of his left gluteus and quad muscles. She also noted back pain, bone and joint symptoms, muscle weakness, and myalgia. She continued to note weakness and pain on

---

[10] These are the dates on the medical records submitted to the Appeals Council, however it appears that Grothe remained under Dr. Miller's care for much longer. A letter from Dr. Miller re-asserting her opinion as to Grothe's limitations, dated February 24, 2014, was also made part of the record. (Tr. 712).

November 10, and December 20, 2011, and on January 20, February 24, and June 26, 2012. Her treatment notes also include a detailed history of the medications she prescribed and renewed at each visit.

The ALJ also noted that the severity of the limitations Dr. Miller imposed related to sitting, standing, and walking were not supported by the total evidence of the record. But the additional treatment records provide evidence to support Dr. Miller's imposed limitations. For example, edema (swelling in his ankle) was noted after Grothe had been sitting for approximately three hours. (Tr. 697). On another occasion, lymphedema was noted in his left lower leg, and she prescribed Jobst stockings. (Tr. 703). This supports her opinion that Grothe had limitations on both walking and sitting for extended periods.

Also during this time, Grothe reported symptoms of a major depressive episode. (Tr. 689). Dr. Miller prescribed Celexa (20 mg. once per day). On February 20, 2012, Dr. Miller noted in regards to the depression that Grothe reported he was "starting to feel like my old self." (Tr. 694). On March 5, 2012, Dr. Miller noted that Grothe's anxiety had increased again, and she switched him to Xanax (0.5 mg, four times per day). (Tr. 699). As of March 19, 2012, Dr. Miller reported that Grothe was doing much better on a new regimen of Xanax. (Tr. 702).

The Appeals Council considered this additional evidence as required by 20 C.F.R. § 404.970(b), but found that the information did not provide a basis for changing the ALJ's decision and therefore denied review. (Tr. 2, 5). In light of additional evidence showing that Grothe had a treatment relationship and history of nearly a year with Dr. Miller, as well as some evidence in her treatment notes to support her opinion as to Grothe's physical limitations, I find that the ALJ could change his decision as to how much weight to afford Dr. Miller's opinion.[11]

The ALJ also pointed out that there were inconsistencies within Dr. Miller's own cited limitations. An ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better medical evidence, or where the treating physician renders inconsistent opinions that undermine his credibility. *Perkins v. Astrue,* 648 F.3d 892, 897-98 (8th Cir. 2011). The inconsistencies the ALJ points to appear to be nothing more than a difference in pre-printed forms. For example, on one document Dr. Miller checked that Grothe could stand and/or walk continuously for less than fifteen minutes. On a different form, she checked that he could stand for fifteen minutes at a time. However, on the second form, there was no option for less than fifteen minutes, but

---

[11] Because I am remanding the case, I need not consider the argument that the ALJ failed to develop the record as required under SSR 96-5p. Given that Dr. Rowley's records from the same practice and the radiology reports from Southeast Missouri Hospital, including some ordered by Dr. Miller, were submitted, it appears to me that the failure to include Dr. Miller's records may have been an oversight on the part of the hospital when it provided the records.

more than none.  Similarly, on the first form Dr. Miller checked the box to indicate that Grothe could occasionally lift and/or carry fifteen pounds.  On the second form, Dr. Miller's only options were ten pounds or twenty pounds, so she chose twenty.  If these can be called inconsistencies at all, they are not the sort that suffices to discredit a treating physician's opinion.   I conclude that, given the additional evidence contained in the records before the Appeals Council, the Commissioner has failed to give appropriate weight to the opinion of the treating physician.

Credibility Analysis

Grothe next argues that the ALJ committed reversible error by rejecting Grothe's testimony regarding his own limitations as not fully credible, without applying the proper credibility factors under *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) and SSR 96-7p.  In particular, Grothe argues that the ALJ did not properly evaluate his work history, did not take into account his surgeries and resulting limitations after his last date of work, and failed to consider the type, dosage, and side effects of his medications.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir.1984).  However, the ALJ may disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir.1990). When considering subjective complaints, the ALJ must consider the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984), which include "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010); *see also Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

An ALJ is not required to explicitly discuss each *Polaski* factor. *Buckner*, 646 F.3d at 558. It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir.2003); *see also Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir.1992) ("We will not disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."). Here the ALJ considered each of the *Polaski* factors, but, especially in light of the additional evidence that was before the Appeals Council, the reasons given for discounting Grothe's subjective complaints do not withstand even minimal scrutiny.

In regards to Grothe's work history, the ALJ noted that he had worked for approximately sixteen years after his motorcycle accident before alleging disability. As Grothe points out, in most cases a good work history tends to support the credibility of the claimant, but here the ALJ found that it detracted from his credibility. While in some circumstances a claimant's continuing to work after alleging disability could detract from credibility, *see e.g., Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992),* the circumstances of each case must be considered. Here the medical record shows that Grothe had increasing pain over the years. Although he continued to work for five years after he began complaining of severe hip pain, the medical records support his complaints of increasing pain. The ALJ found that his last substantial gainful activity was June 30, 2008. It was not until September of 2009 that the large bone mass was removed from his hip. The medical records show that after that surgery he initially showed some improvement but then began having worsening pain. Two years later the rod in his leg was removed and yet even after that he continued to have a limp and pain. Several doctors noted significant muscle damage resulting from the surgeries.

Grothe argues that the consistent use and increase of medication should bolster his credibility in that it shows that his condition has worsened over time. Grothe points to several instances in the medical records where his medications

were changed or increased. At the time of the hearing, Grothe was taking the following medications: OxyContin (15 mg, twice per day), hydrocodone (7.5mg/325mg, six times per day), Lexapro (20 mg, once per day), and Xanax (0.5 milligrams, four times per day). (Tr. 41 – 42). At various times Grothe was taking significantly more medication than he was at the time of the hearing. The ALJ discounted Grothe's claims of side effects from the medications, but he did not discuss the fact that Grothe required a variety and changing number of strong medications to control his pain over a large number of years, which could be seen as supporting his credibility regarding disabling pain.

Because I am remanding the case on the basis of the failure to give the treating physician's opinion appropriate weight, the ALJ will also have the opportunity to reconsider Grothe's credibility in light of the additional medical evidence submitted by Dr. Miller.

## VII. <u>Conclusion</u>

I conclude that in light of the additional evidence submitted to the Appeals Council, the decision of the Commissioner is not supported by substantial evidence. I will therefore remand this case to the Commissioner to determine whether Dr. Miller's opinion should be given greater weight and to reconsider Grothe's credibility in light of the additional records.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accord with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2015.